MONCURE, J.
The first count of the declaration seems to be good, in substance at least if not in form; and I think the demurrer thereto was properly overruled. Indeed there is no complaint of error in the judgment in that respect.
The first and main question in this case arises on the instruction given to the jury in lieu of the second instruction asked for by the plaintiffs in error. Their liability for . the value of the slaves in controversy under the first count of the declaration, depends upon whether the death of the slaves Was occasioned by an3' default of the plaintiffs in error, the hirers of the slaves. If it was so occasioned, they are so liable; if it was not, they are not. Upon this subject I presume there can be no doubt; and this appears to have been the opinion of the Circuit court in giving the third instruction asked for by the plaintiffs in error. But that court, in giving the instruction which was given in lieu of the second instruction asked for, seems to *have been also of opinion that if the slaves were hired with an agreement that they were to be employed only on that part of the Richmond and Danville railroad which runs through the county of Amelia, and if the hirers in violation of the agreement carried the slaves beyond the limits of the county of Amelia into the county of Chesterfield, and- there worked them on said road; then that such violation was a conversion of the said slaves to the use of the hirers, and rendered them liable for the value of the slaves under the second count of the declaration (which is a count in trover), whether the death of the slaves was occasioned by such violation or not. I will now proceed to enquire as to the correctness of this opinion.
| To sustain an action of trover, the plaintiff must have a general or special property in the. subject of the action, and a right of possession over it at the time of the conversion. Saund. on Plead. 869. A man who has delivered goods to a carrier or other mere bailee, and so parted with the actual possession, may maintain trover for a conversion bjr a stranger; for the owner has still possession in law against a wrong doer; and the carrier or other mere bailee is no more than his servant. Id. 873. But where property is bailed for a term, the bailor, having no right of possession, cannot maintain trover against a stranger for converting the property during the term. Id. 879. And this is the case though the con-I version- consist in an absolute sale of the ; property under an execution against the | bailee. Gordon v. Harper, 7 T. R. 9; Brad *542 ley v. Copley, 50 Eng. C. L. R. 865. A bailee for a term, as for instance a hirer of a slave for a year, has an estate in the property during the term, and that estate must be determined before an action of trover can be brought against him in regard to the property. If the action be brought against him for an act done during the term, such act, to sustain the ^action, must have the double effect of putting an end to the bailment, and converting the property. It is not every violation of the contract by the bailee which will have that effect. A mere nonfeasance will not have it. Nor, it seems, will any misuser or abuse of the thing bailed in the particular use for which the bailment was made. Swift v. Mosely, 10 Verm. R. 208. But there are some acts which, being done by the bailee, will have that effect. The wilful destruction by him of the thing bailed will have it. So also if the bailee use the thing for a purpose or in a manner not authorized by the terms of the bailment, and such misuser be the cause or occasion of its loss, he will be liable in trover for its value. Such was the decision of this court in Spencer v. Pilcher, 8 Leigh 565. There the slave was hired in- the county of Wood for agricultural purposes. In violation of the contract, he was carried by the hirer on a dangerous voyage, in the course of which he was drowned; and the hirer was held to be liable in trover for his value. But such liability was expressly put upon the ground that the loss of the slave was occasioned by the violation of the contract, and not upon the ground that such violation would have made the hirer liable for the loss, whether so occasioned or not. The instruction of the court below, which was sustained in that case, was, “that, if the jury are satisfied from- the evidence that sending the slave on the voyage was a manifest abuse of the right temporarily acquired by the hiring, and that he was lost to the plaintiff in consequence thereof, such abuse is equivalent to a wrongful or injurious conversion, and may sustain the count for trover.”
It has been decided in England, in several cases, that an absolute sale of property by the hirer during the term of the hiring, is such an act of conversion as makes him liable in trover for its value. Loeschman v. Machin, 3 Eng. C. L. R. 359, decided by Abbot, C. J., at nisi prius ■in 1818, is the leading case of that class. It was followed by the Court of common pleas in Cooper v. Willemott, 50 Id. 672, decided in 1845. Tindal, C. J., was of opinion ■ that the bailment in Loeschman v. Machin, was determined by the demand. •But supposing it not to have been so determined, he said he could not get over the authority of that case, and was not prepared to ■dispute the position taken therein. It was also followed by the Court of exchequer in Bryant v. Wardell, 2 Welsb. Hurls. & Gord. 478, decided in 1848; and in Fenn v. Bittleston, 8 Eng. Law & Equ. R. 483, decided in 1851. The doctrine, though recent in its origin, and though its introduction was strenuously resisted, may now be considered as firmly established in England. But it seems to rest on the ground that a sale of property by a bailee is equivalent to its destruction, so far as his liability is concerned; and so comes within the principle laid down in Co. Lit. 71 a (3 Thomas’ Coke 372), that if one lends oxen to another to plough his lands, and he kills them, the owner may have trespass or trover at his election; that such a sale operates like a disclaimer of tenancy at common law; that it disables the bailee from returning the property at the end of the term; and though it does not amount to an actual destruction of the property, yet it is so entirely inconsistent with the terms of the bailment that it puts an end to it, causes the possessory right to revert to the bailor, and entitles him to maintain an action of trover. See the judgment of the court delivered by Parke, B., in Fenn v. Bittleston, supra.
The doctrine of the case of Eoeschman v. Machin has been followed in some of our sister states, a,s for instance in New Hampshire, Sanborn v. Colman, 6 New Hamp. 14; and Vermont, Swift v. Mosely, 10 Verm. R. 208. But it has not been followed in North Carolina. *Andrews v. Shaw, 4 Dev. R. 70; and Lewis v. Mobley, 4 Dev. & Bat. 323. In the former case the hirer of a slave for a year sold it; and trover was brought against him by the owner during the year. Ruffin, C. J., said, Í ‘Loeschman v. Machin is a nisi prius decision of C. J. Abbot, and is not satisfactorily reported.” — “If it is meant in that case to say that a bailee upon hire for a determinate period forfeits his interest by abuse to the article, or by a wrongful sale, so that a purchaser from him gets nothing, I think it is not law. ' I do not know of any such doctrine of forfeiture as applied to personal chattels.” He thought the case came within the principle of Gordon v. Harper,- and judgment was given for the defendant. In the case of Eewis v. Mobley, a tenant for life of a slave sold it absolutely, and after his death the remain-dermen brought trover against the purchaser. Gaston, J. in delivering the opinion of the court, said, “To maintain the action it is indispensable that the plaintiff should show a conversion by the defendant of property whereunto the plaintiff, at the time of that conversion, had a present right of possession. It is certain that an action could not have been brought for this alleged conversion during the life of William Kemp (the tenant for life), because the right of possession had not then accrued to the ultimate proprietors- Gordon v. Harper, 7 T. R. 9; Andrews v. Shaw, 4 Dev. R. 70. And it follows as clearly, we think, it could not lie after the death of William Kemp, when the right of possession accrued, because there was no act of conversion thereafter.”
In Virginia the doctrine has not directly come in question, so far as it is applicable to the hire of a slave or other property for *543 a year, or other term. In Poindexter v. Davis, 6 Gratt. 481, a tenant for life of a slave had sold it to a person who, believing' he had an absolute interest in the slave, removed and sold it out of the state. And the question arose whether the *tenant for life or the purchaser from him was liable to the forfeiture imposed by the act 1 Rev. Code, ch. Ill, $ 48, p. 431. The whole court Was of opinion that the absolute sale by the life tenant was not void, but valid to the extent of his interest in the slave. Judge Baldwin said, “It passes to the vendee, as effectually as a rightful alienation, the title of the vendor, and none other; and in no wise divests that of the remainderman or reversioner. It was not the design of the legislature to adopt, in regard to slaves, the common law doctrine of forfeiture by wrongful alienation of tenants for life; which sprang from principles of the feudal law, and was applicable only to conveyances of lands by feoffment, fine or recovery, -which had the effect of discontinuing the estate of him in remainder or reversion.” Id. 497. Judge Allen said, “The bill of sale, though absolute on its face, was not void, because it purports to convey a greater interest than the grantor owned. It operated to vest the grantee with such title as the grantor could part with, and made him the owner of a life estate.” Id. 505. In Philips v. Martiney’s ex’or, 10 Gratt. 333, this court decided that where a tenant for life of a slave sold it absolutely, and after the death of cestui que vie, the remainderman brought trover against the representative of the tenant, they could not maintain the action, not having had the right to the possession of the slave at the time of the sale. And the case of Bewis v. Mobley, supra, was cited and relied on ‘by the court. So far, therefore, as our own decisions go, they tend to show that an absolute sale of personal property by a termor during the term does not work a forfeiture of the term, but is valid to the extent of the vendor’s interest; and therefore does not amount to a conversion of the property for which trover can be maintained. There would seem to be no difference in this respect between a hiring for a year and for a term of years, or even for *life. There may be a difference between a limited interest created by • contract and one created in any other way, arising from the privity of contract existing in the former, and not in the latter case. But it is unnecessary to decide the question in this case (as there was no sale of the slaves in controversy), and I therefore express no opinion upon it.
Thus the law seems to stand in regard to the destruction or sale of property by the hirer thereof, during the term of the hiring. No case in England, so far as I am informed, has gone to the extent of deciding that any misuser of property, short of its destruction or sale, or at least an attempt to sell it (as in the case of Boeschman v. Machin) by a bailee upon hire during the term, will amount to a conversion for which trover will lie. And I am not aware of more than one or two cases in the United States which have gone to that extent; though dicta to that effect are to be found in many cases. There are passages in Story on Bailments which • tend to support that view, and were much relied on by the counsel for the defendant in error in the argument of this case. Section 413 contains a passage of this kind. The writer is there treating of the hire of things; and after giving several instances in which a thing hired for one purpose cannot be used for another, he uses this general language: “And it may be generally stated, that if the thing is used for a different purpose from that which was intended by the parties, or in a different manner, or for a longer period, the hirer is not only responsible for all damages, but if a loss afterwards occurs,, although by inevitable casualty, he will generally be responsible therefor. In short, such misuser is deemed at the common law a conversion of the property for which the hirer is generally held responsible to the letter to the full extent of his loss.” The word “generally,” which is twice used in this passage, is indefinite ; and it does *not appear what cases, in the writer’s view, would fall within the general rule, and wha”t within the exceptions. If he merely intended to say that the hirer is responsible for the loss when it is occasioned by the misuser, though inevitable casualty be the proximate cause of the loss, no fault can be found with the position. Spencer v. Pilcher was a case in which, while misuser was the occasion of the loss, inevitable casualty was the proximate cause of it. If the slave in that case had not been wrongfully carried on a dangerous voyage, he would not have been drowned : though having been so carried, there was thereafter no want of due care on the part of the hirer, and the drowning was purely accidental. That kind of inevitable casualty is no excuse to a wrong doer, v7ho cannot apportion his wrong by saying, that the proiierty might have been lost in some other way if it had not been misused. But if the writer intended to say that every such act of misuser by a hirer, whether it be the cause or occasion of the loss of the property or not, is a conversion thereof, and works a forfeiture of his interest therein, I do not think his position is sustained by authority, or by reason. The cases which he cites in support of the passage do not sustain it in this view. Among them are three Massachusetts decisions, which were much relied on in the argument, especially the first of them, viz: Wheelock v. Wheelwright, 5 Mass. R. 104; Homer v. Thwing, 3 Pick. R. 492; and Rotch v. Hawes, 12 Id. 136. Wheelock v. Wheelwright was a special action on the case for the value of a horse hired to be rode four and a half miles, and to be returned by 7 o’clock P. M. ; but which vras rode nine miles, and died at 10 o’clock P. M. in the possession of the hirer. The facts were agreed, and among them, that the defendant did not ride the horse immod *544 erately, or neglect to feed, or cover him properly with clothes. The court was of opinion that the case agreed had negatived *the gravamen alleged in the declaration,and that the plaintiff could not recover in that action. But the court proceeded further to say, “the defendant, by riding the horse beyond the place for which he had liberty, 'is answerable to the plaintiff in trover, ’ ’ &c. This is not a part of the decision of the court. Though I do not mean to say it would have been an erroneous decision, if the action had been trover. The hirer retained and used the horse after the period for which it was hired, as well as for a longer journey; and so was like any other wrong doer having no interest in the property which is the subject of the wrong. Homer v. Thwing was an action of trover against an infant for the conversion of a horse, and was similar in its facts to Wheelock v. Wheelwright, on the authority of which it was decided. The observations last made in regard to that case apply also to this. Rotch v. Hawes was also an action of trover for the conversion of a horse. The action -was not sustained, because the owner received payment of hire for the whole distance traveled, and thereby ratified the act of the hirer in going further than the original contract allowed. Though the court took occasion to say, “there can be no question but that the plaintiffs’ action would be maintained if they had relied upon the original contract.. They might have elected and insisted that the defendant converted the horse by going beyond the journey agreed upon.’’ The observations above made in regard to Wheelock v. Wheelwright apply also to this case. ■ It is unnecessary to notice any of the other authorities cited by Story in support of the passage above quoted, as none of them seem to go so far as the three cases on which I have just commented.
In the last edition of his work on bail-ments, g 413 is followed by. ? 413 a, b, c and d, which are not in the first edition, and which show that the general rule as laid down in ? 413, is by no means settled, and at *all events is subject to material qualifications and exceptions. In § 413 a, he remarks, “But although this is the general rule, a question may arise how far the misconduct or negligence or deviation from duty of the hirer will affect him with responsibility for a loss which would and must .have occurred even if he had not been guilty of any such misconduct, negligence or deviation from duty. ’ ’ And after giving, in that and subsequent sections, various instances in illustration of this remark, he concludes, § 413 d, with this observation: “The question, therefore, in the present state of the authorities, must still be deemed open to controversy. Whenever it is discussed, it will deserve consideration, whether there is or ought to be any difference between cases where the misconduct of the hirer amounts to a technical or an actual conversion of the property to his own use, and cases .where there merely is some negligence or omission, or violation of duty in regard to it, not conducing to or connected with the loss.”
I think the doctrine laid down by Story in § 413, receives no support from any thing to be found in Jones on Bailments. There is a passage on p. 121, which, taken by itself, seems to tend that way. “A borrower and a hirer (he says) are answerable in all events, if they keep the things borrowed or hired after the appointed time, or use them differently from their agreement. ” But this passage must be'taken in connection with what he says elsewhere, and especially at p. 70, where he says, “If the bailee, to use the Roman expression, be in mora, that is, if a legal demand have been made by the bailor, he must answer for any casualty that happens after the demand, unless in cases where it may be strongly presumed that the same accident would have befallen the thing bailed, even if it had been restored at the proper time; or, unless the bailee have legally tendered the thing, and the bailor *have put himself in mora, by refusing to accept it: this rule extends of course to every species of bailment.” In fact there is nothing said in the work about the action of trover, or any difference between the extent of liability in that form of action, and in a special action on the case or upon the contract of bailment. In the passage above quoted, the writer is referring to a liability which may be enforced in the latter form of action; and the words “all events,” and “casualty,” contained in those passages, are to be construed as events and casualties occasioned by the wrongful act of the bailee.
Hor is the doctrine sustained by any of the other authorities cited by the counsel for the appellees. Duncan v. The South Carolina Railroad Co., 2 Richardson’s R. 613, was an action of covenant. McDaughlin v. Lomas, 3 Strobhart’s Law R. 85, seems to have been a speqial action on the case, and not trover. Mullen v. Ensley, 8 Humph. R. 428, was a suit in chancery. The Mayor, &c., of Columbus v. Howard, 6 Georgia R. 213, was an action on the case, and the declaration contained a count in trover. In all these cases the recovery was sustained upon the ground that the death or injury of the slave (which was the subject of controversy therein respectively) resulted from his being used for a different purpose from that intended by the parties, or else that the loss ensued from gross negligence, or other violation of the contract of hiring on the part of the hirers. In most or all of them, the doctrine laid down by Story is repeated, or referred to by the judges or some of them; but it is obvious that none of the cases rest upon that doctrine.
The only case I have seen which seems fully to sustain it is Horsley v. Branch, 1 Humph. R. 199, founded on the authority of .a former decision of the same court, in *545 Angus v. Dickinson, Meigs’ R. 459, which I have not seen.
*'Upon the whole, I am of opinion that in the case of a bailment upon hire for a certain term (whatever may be the law in regard to a deposit, a mandate, or other gratuitous bailment, or any bailment during the mere pleasure of the bailor, as to which it is unnecessary to express any opinion), the use of the property by the hirer during the term, for a different purpose or in a different manner from that which was intended by the parties, will not amount to a conversion for which trover will lie, unless the destruction of the property be thereby occasioned; or, at least, unless the act be done with intent to convert the property, and thus to destroy or defeat the interest of the bailor therein. Whether, if the act be done with such intent, but do not occasion the destruction of the property, it amounts to a conversion, is a question not necessary to be decided in this case. Without intending to express an opinion upon it, I will consider it as answered affirmatively, for the purposes of this case.
The hirer may be restricted in the use of the property by the terms of the hiring, and will be liable for all damages arising from a violation of his contract, on the same principle, and to the same extent, on which a party to any other contract is liable for its violation. An express provision in the contract that the bailment shall be determined by a violation of any its terms bj7 the bailee, would doubtless be valid. But a bailment upon hire is not conditional in its nature, any more than any other contract ; and, in the absence of an express provision to that effect, the bailee will not, in general, forfeit his estate by a violation of any of the terms of the bailment.
If anjr violation of the contract by the hirer, with the exceptions before mentioned, would work a forfeiture of his interest, and be a conversion of the property, it is strange that no case to that effect can be found in any of the Hnglish reports. The only case I *have seen in those reports, in ■which such a doctrine seems to have been contended for, is Lee v. Atkinson, decided in 8 Jac. 1, and reported in Yelv. R. 172, and Cro. Jac. 236. There, A hired a horse to B for two days, and to go to a certain place. B was riding the horse to another place, when A attempted to take him away. B brought trespass against A, who pleaded justification. But the plea was not sustained. The reason assigned for the judgment was, that ‘‘the plaintiff had a good special property for the two days against all the world; and although the defendant pretends that the plaintiff misbehaved himself in riding to another place than was intended, yet that is to be punished by an action on the case, but not to ¡ seize the gelding.” It may be said that A | had no right to unhorse B by violence, even j though the bailment had been determined;; and therefore it was unnecessary to decide [ whether or not it was determined by the | wrongful act of B. I refer to the case only as tending to show the opinion of the court on the subject at that early day, and in the only case in which it seems to have come under judicial consideration - in Rngland, even incidentally.
The exceptions to the general rules (that for an injury to hired property during the term, trover cannot be maintained by the bailor), seem to rest upon the ground that the bailment is determined by the voluntary act of the bailee. If he -destroys the property, of course he determines the bailment. His duty is to take due care of the propertj7 during the term, and return it to the bailor at the expiration thereof. By destroying, he disables himself from returning it. There seems to be no difference, in this respect, between its willful destruction by him, and a destruction arising from his using it in a manner or for a purpose not authorized by the contract. In either case it may be said that the bailment is determined by his voluntary 'x'acl. If he sells the property absolutely, he also disables himseif from returning it, and renders it difficult for the bailor to regain possession at the expiration of the term. If he attempts to sell it, or exercises any other act of absolute ownership over it, his act is so entirely inconsistent with the terms of the bailment, and so subversive of the rights of the bailor, that it may have the effect of determining the bailment. It may operate like a disclaimer of tenancy at common law7, and deprive the bailee of the protection of the bailment in an action of trover for the conversion of the property. But if he merely use the property in a manner or for a purpose not authorized by the contract, and without destroying it, or without intending to injure or impair the reversionary interest of the bailor therein, such misuser does not determine the bailment, and therefore is not a conversion for which trover will lie. The bailee does not therébj7 violate any posses-sory right of the bailor, nor disable himself from delivering the property to the bailor at the end of the term. He is entitled to the exclusive use of it during the term, and intends only to use it during that period. He does not disclaim the title of the bailor. He is not like a wrong doer having no interest in the property, and who is guilty of a conversion if he take or detain it for the use of himself or another; “for this simple reason, that it is an act inconsistent with the general right of dominion which the owner of the chattel has in it, who is entitled to the use of it at all times and in all places.” Alderson, B., in Fouldes v. Willoughby, 8 Mees. & Welsb. 54. In such a case the wrongful act is conclusive evidence of an intention to convert, as a man is presumed to intend the natural and necessary consequence of his act. No such conclusion can be drawn from the mere misuser of property bjr a hirer during the term. The act of misuser, to be a conversion, must occasion the loss of the property, *or be done with the actual intent to *546 convert it. A contrary doctrine would be attended with very harsh and unjust consequences. A man hires a slave for a year, to work in one county, and employs it on the first day of the year, in an adjoining county. According to the doctrine in question, he thereby forfeits his interest, and may be immediately sued for the slave, or its value. Or, if he is permitted to retain possession of the slaves until the last day of the year, when it dies, he will, according to that doctrine, be liable for the value of the slave, though employed every other day of the year but the first, in strict pursuance of the terms of the contract, and though its death may not have resulted, directly, or indirectly, from any violation of the contract. The same principle would apply to any term of hiring. And if we suppose a case of hiring for a term of years, or for a lifetime, the injustice of the doctrine will be still more apparent. Its injustice, however, is sufficiently apparent in its application to the very common case in Virginia of the hiring of a slave for- a year. While such a doctrine would do great injustice to the hirer, it is not necessary for the protection of the rights of the owner of the slave. The parties may make the contract conditional, if they choose, and reserve to the owner the right to resume possession for any violation of its terms by the hirer. In the absence of such a condition, a court of equity would doubtless interpose to protect the rights of the owner, if the safety of his slave were likely to be endangered by a violation of the contract by the hirer. The owner has ample, and often concurrent, remedies to recover any damage he may sustain from any violation of the contract or any breach of duty on the part of the hirer in respect to the slave.
Ret us now apply what has been said, to the case under consideration. The hirers in this case did not ^willfully destroy the slaves; nor is it pretended that in employing them in the county of Chesterfield, instead of the county of Amelia, they intended to convert the slaves to their own use, or to injure or impair the reversionary interest of the owner. Then, if such employment of the slaves in Chesterfield instead of Amelia, was a violation of the contract, the liability of the hirers for the value of the slaves by reason of such violation, depends upon whether the death of the slaves was thereby occasioned or not; and is precisely the same under the second as under the first count of the declaration. It makes no difference, in principle, that the slaves died while they were employed in the county of Chesterfield; though it is a very important circumstance for the consideration of the jury in determining whether the death of the slaves was occasioned by the supposed violation of the contract. If the slaves had been employed but a short time in Chesterfield, and then carried to Amelia and employed there until their death, it might have been an easy matter to have determined whether their death resulted from their temporary employment in Chesterfield. But having been employed only in Chesterfield, and died there of pneumonia, it may be very difficult to show that their death would have happened if they had been employed only in Amelia. The burden of satisfying the jury of this fact devolves on the hirers, as the loss happened while their supposed wrongful act was in operation and force, and may have been occasioned by that act. Though difficult, it may not be impossible, to bear this burden. The nature of the disease of which the slaves died; its prevalence in the neighborhood of the place where they would have been employed in Amelia; the proximity of that place to the place of their death ; would be material circumstances for the consideration of the jury, and might of themselves, or in connection with '*others, satisfjr them that the slaves would have died if there had been no such violation of the contract as the instruction supposes. The case, in principle, very much resembles several stated in the sections in Story on Bailments, before referred to; and especially the case of Davis v. Garrett, 6 Bing. 716, 19 Eng. C. L. R. 212, referred to in § 413 d, and cited at length in note 5 to that section. That was a special action on-the case to recover damages for the loss of a cargo of lime. The plaintiff put the lime on board the defendants’ barge to be conveyed from Medway to Rondon. The master of the barge deviated unnecessarily from the usual course, and during the deviation a tempest wetted the lime, and the barge taking fire, the whole was lost. The objection taken was that there was no natural or necessary connection between the wrong of the master in taking the barge out of its proper course and the loss itself; for that the same loss might have been occasioned by the very same tempest, if the barge had proceeded in her direct course. Tindal, Ch. J., said, “We think the real answer to the objection is, that no wrong doer can be allowed to apportion or qualify his own wrong; and that as a loss has actually happened whilst this wrongful act was in operation and fprce, and which is attributable to his wrongful act, he cannot set up, as an answer to the action, the bare possibility of a loss, if his wrongful act had never been done. It might admit of a different construction, if he could show not only that the same loss might have happened, but that it must have happened, if the act complained of had not been done; but there is no evidence to that extent in the present case.”
I am therefore of opinion, that the Circuit court erred in giving the instruction in question to the jury. It was argued by the counsel of the defendant in error, that the instruction as given was true, as a general *proposition at least; that if there are exceptions to it, the evidence stated in the bill of exceptions does not show that his case is one; that if it be not one, the plaintiffs in error could not have been injured by the instruction ; that it was *547 incumbent on them as the exceptants, to set out in the bill of exceptions sufficient evidence to show that they may have been injured by the instruction ; and that therefore the court did not err in giving it. The proposition is not stated in the instruction as a general one merely. Nor could it have been so stated with propriety. The true rule on the subject is not, properly speaking, a general rule subject to exceptions, but is a simple rule to this effect, that if hired property be used by the hirer for a purpose or in a manner not authorized by the terms of the hiring, and the loss of the property be occasioned by such misuser, he is liable in trover for its value.
It was the province of the jury to determine from the evidence, whether the death of the slaves was occasioned by the supposed violation of the contract or not. There may have been little evidence before them tending to show that the death of the slaves was not so occasioned. It cannot perhaps be said that there was none. The plaintiffs in error may at least have supposed there was enough to entitle them to the instruction which they asked for, and which expounded the law in their view of it. But according to the view which the court took of it, in the instruction given, it was immaterial whether the death of the slaves was occasioned by the supposed violation of the contract or not. That instruction closed the door to the admission of other evidence on the subject, and it would have been vain to have offered it. We cannot therefore presume that there was no other, and that the plaintiffs in error were not injured by the instruction. See Wiley v. Givens, 6 Gratt. 277. I think x'the court, instead of that instruction and the instructions numbered two and three, moved for by the plaintiffs in error, ought to have given an instruction to the jury to the following effect: ‘ ‘That if there was a special contract between the plaintiff and the defendants, that the slaves which are the subject of controversy were to be employed on that part of the Richmond and Danville railroad which runs through the county of Amelia only; and if the defendants did carry them beyond the limits of said county' into the county of Chesterfield, and there employ them on said road; such wrongful act was not, of itself, a conversion of the said slaves to their use. But if the death of the slaves was occasioned by the said wrongful act, then the said act, in connection with the death of the slaves, was a conversion of them by the defendants to their use, and made them liable, under either count of the declaration, for the value of said slaves: And if such death occurred while the said wrongful act, by which it may have been occasioned, was in operation and force, the burden of satisfying the jury that it was not so occasioned, devolves on the defendants.”
I think there is no other error in the judgment. It would have been improper to have given the instructions numbered four and five, because it belonged to the jury to determine from all the evidence, whether the supposed conversion, in the working of' the slaves out of Amelia county, was waived or not; and also because, whether that act was a conversion or not, depended upon whether it occasioned the death of the slaves or not; and a waiver of the supposed conversion could not be inferred from facts which transpired, if at all, before the death of the slaves.
It would have been improper to have given instruction number six, because the evidence shows that the amount of hires for the slaves up to the period of their deaths was received by the agent of the defendant in *error since the institution of this suit, and since the first trial had therein. The inference of a waiver of the supposed conversion, which might have been drawn from a reception of the amount of hires, had that fact stood alone, is repelled by the additional fact of the pen-dency and prosecution of the suit at the time of such reception.
The objection made to the instruction given in lieu of number four, is, that it assumes the fact (of which the determination belonged to the jury'), that by the original contract, the slaves were to be worked only in the county of Amelia. If this instruction had stood alone, the objection made to it might have been valid. But it must be taken in connection with the other instructions; and so taken, there can be no doubt, and could have been none on the minds of the jury, as to the meaning of the court. The question, whether by the original contract the slaves were to be worked only in Amelia, was expressly referred to the decisions of the jury in the other instructions at the same time given; and it would have been plainly repugnant to those instructions if the court had told them that such was in fact the original contract. The plaintiffs in error in number four moved for an instruction based upon the assumption of this fact, or the belief of it by the jury. The court declined giving that instruction, but gave one based on the same assumption, pro hac vice. The instruction given is to be understood as if after the words “changed the original contract,” the words “supposing it to be as stated in instruction number four,” had been inserted therein.
In regard to the instruction mentioned in the second bill of exceptions, some of the parol evidence was certainly admissible, and therefore it would have been improper to have excluded all. It would have been just as improper to have instructed the jury in general terms to disregard all parol evidence tending to alter, *vary, explain or add to the written contracts mentioned in the said bill of exceptions. Nor was the court bound to sift the mass of evidence in the case, and determine which would alter, vary, explain or add to the written contracts, and which would not. It was the duty of the parties moving the instruction to point out the particular evidence objected to; and not having done so, *548 the court, on that ground, was justifiable in refusing to give the instruction.
I am for reversing the judgment, setting aside the verdict, and remanding the cause for a new trial to be had therein.
DANIEB, J.
The main enquiry here has been as to the correctness of the instruction given by the Circuit court in lieu of instruction number two, asked for by the plaintiffs in error.
The instruction given has manifest reference to the instruction asked for, and the true meaning of the former appears only on the reading of the two competing propositions together.
The instruction which the court was asked to give was, that if the jury believed, from the evidence, that there was a special contract between the plaintiff and the defendants, that the slaves which are the subject of controversy were hired to the defendants to be worked by them on the Richmond and Danville railroad, in the county of Amelia, and that the said slaves were worked by the defendants on the said Richmond and Danville railroad, in the county of Chesterfield, but were not thereby subjected to any greater labor, nor exposed to any greater risk whatever, than if the said slaves hfid been worked in the county of Amelia, and that while so worked in the said county of Chesterfield the said slaves sickened and died, but not in consequence of being so worked in the said county of Chesterfield, nor in consequence of anjr neglect or *want of due care and attention on the part of the defendants, then the jury should find no damages by reason of such sickness and death of said slaves.
This instruction the court refused to give; but instructed the jury, that if they should believe, from the evidence, that there was a special contract between the plaintiff and the defendants; that the slaves which are the subject of controversy were hired by the plaintiff to the defendants, with an express stipulation and agreement that they were to be employed on that part of the Richmond and Danville railroad which runs through the county of Amelia only, and that they were not to be worked on said road out of said county, and that the defendants did carry them beyond the limits of said county of Amelia into the county of Chesterfield, and there worked them on said road, that such carrying them beyond the limits of the county of Amelia, and working them in the county of Chesterfield, was of itself a violation of their contract, and a conversion of the said slaves to their use, 'by reason of which theyr became immediately responsible to the plaintiff for the value of said slaves, in the event of their death.
It will be seen that the .instruction, as given, has no express reference to the time, place or circumstances of the death of the slaves, but in terms rests the responsibility of the defendants, for the value of the slaves, under the supposed breach of contract, on the event of the death of the slaves, generally. But when we see, on looking to the evidence, that it distinctly states the fact that the slaves died during the year for which they were hired, in the county of Chesterfield, whilst there employed in the service of the defendants, and that the instructions asked for are based on the jury’s finding that they did so die, there can be no difficulty in understanding the court as meaning to say, that if the jury believed there was such a contract *as that supposed in the instructions, and a breach of it by carrying the slaves to Chesterfield, and there working them, followed by the death of the slaves, occurring whilst so at work in Chesterfield, then the plaintiff in the action was entitled to recover of the defendants the value of the slaves.
Does not the instruction thus understood, propound the law correctly? I think it does. I do not think there can be any doubt of the truth of the proposition stated as a general rule, that where the hirer of property uses it for a purpose or in a manner different from that provided for in the contract of hiring, and the property is lost in such user, the hirer is at once answerable for the loss; that the letter to him may treat such misuser and loss as a conversion of his property, and have immediate resort to his action of trover, even before the term for which the property was hired, has expired by efflux of time: And that no care or diligence on the part of the hirer to save the property from loss during such illegal use or employment, can be set up as a bar to the recovery of the full value of the property. See Story on Bailment, \ 413; Spencer v. Pilcher, 8 Leigh 565; Homer v. Thwing, 3 Pick. R. 492; Wheelock v. Wheelwright, 5 Mass. R. 104; Rotch v. Hawes, 12 Pick. R. 136; Angus v. Dickerson, 1 Meigs’ R. 459; Mayor, &c. of Columbus v. Howard, 6 Georgia R. 213; McLauchlin v. Lomas, 3 Strobh. R. 85; De Tollemere v. Fuller, 1 Const. Court S. Car. 117.
The case last cited is very similar in its features to the one under consideration. In that case the defendant hired sundry slaves ; and among them was one, who, by the terms of the contract, was to remain on the farm as a nurse and cook-. The defendant sent her to Charleston to attend a sick lady. Whilst there, engaged in that service, she took the small-pox and died. The defendant was warned by plaintiff’s agent *of the dangers to which the slave was exposed, but did not send her away. He was held liable for the loss, on two grounds: Pirst, for negligence in not sending the slave away after being warned of her danger; and secondly, on the ground, as stated by the court, that “where property is bailed for a particular purpose, and it is used for a different purpose, the bailee is liable, even if it appear that he has used due care and attention, the legal presumption being that the loss happened in consequence of this misuser.”
It is said, however, that though the rule *549 be as I have stated it, it is nevertheless subject to qualifications and exceptions, which the judge ought to have announced in the instructions.
It is true, that in Story on Bailments, § 413 a, it is said that «. question may arise how far the misconduct or negligence or deviation from duty of the hirer will affect him with responsibility for a loss which would and must have occurred, even if he had not been guilty of any such misconduct, negligence or deviation from duty. As for example, suppose a cargo of lime is put on board of a vessel on freight to be carried from A to B, and the master should unnecessarily deviate from the voyage, and after-wards a storm should arise, and the lime should be wetted, and the vessel should thereby take fire and the whole be lost; according to the general rule, the loss must be borne by the owner of the vessel; for although the tempest might properly in one view be deemed the proximate cause of the loss, yet, according to the doctrine of Pothier, the deviation would be the occasion of the loss; and at the common law, the loss would be held sufficiently proximate to the wrongful act of the deviation, and to be properly attributable to it, so as to support an action by the shipper. But suppose the deviation, although voluntary, were for so short a time or under such circumstances as that the vessel must *have been overtaken by the same tempest, and the same accident must have occurred, the question would then arise whether the owner would be liable for the loss.
And in the following section, the author puts another case of goods shipped on board of a ship on freight for the voyage, to be carried under deck, and, by the misconduct of the master, stowed on deck ; then he says, if the goods are lost by reason of such wrongful stowage on deck, as by a sea which sweeps the deck, there can be no doubt the owner of the ship is responsible for the loss. But suppose the ship should b3r inevitable casualty founder at sea in a heavy gale, and the whole cargo, under deck as well as on deck, should thus be lost, the loss being in no degree attributable to the stowage, then the question would arise whether the owner of the ship is responsible for the loss.
Upon the supposition that these questions ought to be decided favorably to the ship owner, and that such decision would rule in actions of trover (about which I do not deem it necessary to express any opinion), it must be conceded that it would be easy to suppose cases in which the principle might be extended to the relief of a hirer of slaves. As where slaves should be hired to work in a specified branch of the business, in a mine or manufacturing establishment, and they should be put to another service in the same mine or manufacturing establishment, and some casualty should occur involving all, in whatever service there employed, ill one common fate, there the rule suggested by the questions of Story (if law) might apply. But could such a rule have any manner of application to a case like the one under consideration?
The views or intimations of Story on the subject are evidently suggested by the remarks of Chief Justice Tindal in the case of Davis v. Garret, 6 Bing. R. *716; 19 Eng. C. L. R. 212; to which he refers. That was the case supposed by Story, of the cargo of lime shipped and lost, during a deviation of the ship, in a storm, by being wetted and setting the ship on fire. The chief justice, after stating the case, and making a partial answer to the objection put, of there being no necessary connection between the wrongful deviation and the loss itself, proceeds: “But we think that the real answer to the objection is, that no wrong doer can be allowed to apportion or qualify his own wrong; and that as a loss has actually happened whilst his wrongful act was in operation and force, and which is attributable to his wrongful act, he cannot set up, as an answer to the action, the bare possibility of a loss, if his wrongful act had never been done. It might admit of a different construction if he could show not only that the same loss might have happened, but that it must have happened if the act complained of had not been done.”
It is obvious, from the very nature of the rule sought to be deduced from this opinion, that it can apply only to a very limited class of cases; and we should have to pass beyond the range of all experience with respect to the nature of disease, even in supposing a case for the defendants, which, consistently with the facts proved, could satisfy the requirements of the rule, It being proved that the slaves died, in the county of Chesterfield, of pneumonia, there contracted, in order to liken the case to those inevitable casualties on which the rule is sought to be founded, it would have to be supposed that at the time when the slaves died of the disease in Chesterfield, it was prevailing at every point of the work in the county of Amelia at which they could have been employed according to the terms of the contract, infecting and destroj'ing all within its range. I'or if a single point at which the slaves could under the contract have been at work in *Amelia, be left out of such supposed case, as one not visited by the disease, who could undertake to say that they might not have been at that point? Or if any be supposed to have escaped the fatal influence of the disease, who could say that these slaves might not have been equally fortunate?
Whilst therefore I do not desire to be understood as affirming the impossibility of imagining a state of proofs which, consistently with the evidence set out in the bill of exceptions, could bring the case within the influence of the supposed qualification of the rule which the defendants desired to be declared in the instructions, I feel no hesitation in expressing the opinion that said evidence was not only wholly insufficient for the purpose, but did not conduce to such a result.
*550 It was proved that the slaves died, during the year, while at work in the county of Chesterfield, of pneumonia, a disease which was very prevalent throughout that county at the time of their death. That during their sickness they were attended by a physician, and received all necessary and proper attention, and were provided with all necessary and proper comforts, and that the neighborhood of the places in the county of Chesterfield where the slaves died is a healthy neighborhood, and as healthy as the adjoining counties. It is obvious, I think, that there is nothing in this evidence, taken as a whole, or in any portion of it, taken by itself, which tends to prove that the slaves must or even probably would have died, if they had not been carried to Chesterfield. It asserts positively that they died of pneumonia, and that pneumonia was prevailing extensively at the time in Chesterfield. The fact that the negroes were properlj' attended to and provided for, whilst it exonerates the defendants from any imputation of neglect after the slaves sickened of the disease, does not tend to any result favorable to the ^defendants. It does not in the slightest degree conduce to show that the slaves must have sickened and died of pneumonia if they had been permitted to remain in Amelia. Nor is there any such tendency in the evidence with respect to the general health of the neighborhood of the places in which the slaves died. There was evidence to show that pneumonia was prevailing in Chesterfield, and none to show that ’t was prevailing in Amelia: And proof that the two counties stood on an equal footing in regard to health generally, has no tendency to establish the fact that the slaves must have become the victims of pneumonia if they had staid in Amelia.
With these views of the case, I cannot perceive how the defendants could have sustained any injury from the instructions of- the court. No matter how true may be the proposition of law for which they contend, they cannot complain of the failure of the court to propound it to the jury, inasmuch as they have failed to show that there were any facts in the cause, or evidence tending to prove the facts calling for the Application of such a proposition. It was not necessary for them to set out all the evidence in the case in their bill of exceptions, but it was incumbent on them to set out enough to show that they might have sustained injury from the ruling of the court. The court is bound, at the instance of either party, to instruct the jury as to so much of the law, and only as to so much, as governs the case presented by the evidence. Each party has a right to have the jury pass on any evidence which by rational deduction may lead to the finding of the facts that would make out this case or maintain his defense; but neither has a right to complain because of the court’s refusing to declare abstract propositions of law ruling a supposed state of facts which no jury could find without indulging in mere ran- | dom surmises and unfounded speculations. The ^Circuit court having stated the general rule governing the case which the evidence proved or tended to prove, was not bound to go farther and state all exceptions to the rule that might obtain in every possible phase of the case that it might be within the range of human testimony to present.
The probable if not the inevitable consequence of giving such an instruction as the defendants in the action say ought to have been given, would have been a misleading of the jury. They could not well have come to any other conclusion than that the judge believed there was something in the case to which the instruction could be applied. Confidence in this supposed belief might have been substituted by the jury in the place of their own views of the evidence, or otherwise they might have supposed that they had a license to go into uncontrolled guess and conjecture as to what might have been the possible fate of the slave had they remained in Amelia.
I can see no error in the course of the Circuit court in regard to this instruction; and concurring as I do in the conclusions of the majority of the court here, in relation to the other causes of error assigned, am for affirming the judgment.
ALEEN, EEE and SAMUELS, Js., concurred in the opinion of Moncure, J.
The judgment was as follows:
The court is of opinion, that if the facts were as supposed in the instruction given by the Circuit court in lieu of instruction number two, moved for by the plaintiffs in error, their wrongful act of carrying the slaves, which are the subject of controversy, beyond the limits of the county of Amelia, and working them in the county of Chesterfield, was not of itself a conversion of the said slaves to their use, by reason of *which they became immediately responsible to the defendant in error for the value of said slaves in the event of their death, whether occasioned by such wrongful act or not. But the court is further of opinion, that if the death of said slaves was occasioned by the said supposed wrongful act, then the said act, in connection with the death of the slaves, was a conversion of them by the plaintiffs in error to their use, and made them liable, under either count of the declaration, for the value of said slaves: and if such death occurred while the said supposed wrongful act, by which it may have been occasioned, was in operation and force, the burden of satisfying the jury that it was not so occasioned devolves on the plaintiffs in error. The court is therefore of opinion, that the Circuit court erred in giving the said instruction, and ought, instead of that instruction and instructions numbered two and three moved for by the plaintiffs in error, to have given an instruction to the jury to the foregoing effect.
The courtis further of opinion, that there *551 is no other error in the judgment of the Circuit court.
It would have been improper to have given the instructions numbered four and five, because it belonged to the jury to determine not only from the facts therein stated, if proved, but from all the evidence, whether the supposed conversion, and the working of the slaves out of Amelia county, was waived or not; and also because, whether that act was a conversion or not, depended upon whether it occasioned the death of the slaves or not, and a waiver of the supposed conversion could not be inferred from facts which transpired, if at all, before the death of the slaves.
It would have been improper to have given instruction number six, because it appears from the evidence that the reception of the amount of hires for the slaves up to the period of their death was during the pendency of this suit; and the inference of a waiver of the supposed conversion, which might have been drawn '*from a reception of the amount of hires, had that fact stood alone, is repelled by the additional fact of the pendency and vigorous prosecution of the suit at the time of such reception.
The objection made to the instruction which was given in lieu of number four, is that it assumes the fact, of which the determination belonged to the jury, that by the original contract the slaves were to be worked only in the count}' of Amelia. If this instruction had stood alone the objection might have been valid. But it must be taken in connection with the other instructions; and so taken, there can be no doubt, and could have been none on the minds of the j ury,as to the meaning of the court. The instruction is to be understood as if after the words “changed the original contract,” the words “supposing it to be as stated in in-truction number four” had been inserted therein.
In regard to the instruction mentioned in the second bill of exceptions. Some of the parol evidence was certainly admissible; and therefore it would have been improper to have excluded all. It would have been just as improper to have instructed the jury in general terms to disregard all parol evidence tending to alter, vary, explain or add to the written contracts mentioned in the said bill of exceptions. Nor was the court bound to sift the mass of parol evidence in the case, and determine which would alter, vary, explain or add to the written contracts, and which would not. It was the duty of the parties moving the instruction to point out the particular evidence objected to; and not having done so, the court, on that ground, was justifiable in refusing to give the instruction.
Therefore, the judgment is reversed with costs to the plaintiffs in error, the verdict is set aside, and the cause is remanded for a new trial to be had therein; on which the instructions of the court (should instructions be sought by the parties) are to conform to the foregoing opinion and judgment.